Filed 4/28/16  P. v. Guzman CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039532 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. Nos. 211398 & 211138) |
| v. | |
| LORENZO GUZMAN, | |
| Defendant and Appellant. | |

## I. INTRODUCTION

After hearing 16 days of testimony and deliberating for a day and a half, a jury convicted defendant Lorenzo Guzman of all seven charged crimes, including five separate conspiracies. (Pen. Code, § 182, subd. (a).)[1] The jury also found that he had committed six of the seven crimes for the benefit of, at the direction of, or in association with the Nuestra Familia (NF) criminal street and prison gang. (§ 186.22, subd. (b)(1)(A).) The only crime without a gang enhancement was defendant's active participation in the NF criminal street gang between April 25, 2002, and April 23, 2009 (the date of his indictment (count 1; § 186.22, subd. (a)).

---

[1] Unspecified section references are to the Penal Code.

Defendant's trial strategy involved essentially conceding his guilt of the first four counts, which included three conspiracies in addition to the active gang participation alleged in count 1. Two of those conspiracies involved defendant establishing a NF "regiment" in Santa Clara County beginning April 25, 2002. Count 2 alleged that defendant and 25 other individuals who were members and associates of his regiment conspired with others to sell methamphetamine between April 25, 2002 and April 23, 2009. (Health & Saf. Code, § 11379, subd. (a).) Count 3 alleged that defendant and 12 of those individuals conspired with others to sell phencyclidine (PCP) during the same time period. (Health & Saf. Code, § 11379.5, subd. (a).) Count 1 alleged that defendant, along with the 25 individuals named in count 2 and one other, had actively participated in NF and willfully promoted, further, and assisted in felonious criminal conduct by gang members.[2] Count 4 alleged that defendant and seven other individuals, five named in count 2, conspired with others to smuggle a controlled substance into a penal institution between January 1 and June 1, 2007. (§ 4573.)

Defense counsel's opening statement was vague about which counts and enhancements he was conceding, stating only, "we believe the evidence will show, and we agree that Mr. Guzman, my client, has been and is a [NF] gang member." "The idea that Mr. Guzman participated in the distribution of drugs for the benefit of the [NF,] in terms of the exact time period, I'm not going to comment on that. But over a period of time when he was out on the streets, he was just distributing drugs, primarily methamphetamine. And he conspired to do that with other gang members. We're not contesting that issue. We won't be contesting that issue. It's not contestable. It's a fact."

---

[2] According to the probation report, by May 29, 2012, the first day of testimony in this case, 25 of defendant's codefendants had been convicted of conspiracy.

Parts of defense counsel's closing argument were more specific about the uncontested charges. "I told you in the beginning of this case that we're not going to be contesting the fact that Mr. Guzman is a gang member, a gang leader, even a drug dealer. We're not contesting that." "It's clear, it's clear that Mr. Guzman is guilty, and I would expect you to find him guilty of conspiring with other gang members to distribute drugs." "So I would expect that you would find him guilty of those counts, and I would expect that you probably would find the gang enhancement to be true because it was done in association with and for the benefit of." "So I'm conceding, essentially like I did in my opening statement, there's a conspiracy to distribute drugs, and this is another issue, and I'm expecting that you will find Mr. Guzman guilty, at least as those two counts. And that's Count One, that's being actively involved in a criminal street gang. I mean, that's One, Two and Three, basically are—basically, I conceded those in my opening statement."

Defense counsel was more equivocal about count 4, stating, "I haven't paid a lot of attention to the smuggling charge because, I mean, there's inferences there and [the prosecutor's] point is that if [defendant] was involved in any way in that, that there was a conspiracy to smuggle drugs into the jail. You can listen to the evidence on that, and then you can decide." Counsel stated that after telephone conversations conspiring to obtain PCP, defendant's brother Greg Guzman ended up in jail with methamphetamine.[3] "So perhaps there was a conspiracy, but perhaps there wasn't." "It's a little bit hard to understand about the PCP . . . , but it's clear that they were moving drugs. Whether the drugs were brought into the jail for the sake of the gang or not or personal use, I don't

_____

[3] As we will explain in part II.B, *post*, the conspiracy was actually to smuggle PCP *and* methamphetamine into the Santa Clara County Jail.

know. But it says in association with, you might find if it's been proved and the subsequent crimes have been proved."

The only serious challenge to the first four counts that defense counsel made in closing argument was whether they involved multiple conspiracies or one overall conspiracy.[4] After disputing the remaining charges, defense counsel clarified that he was asking the jury to "find my client not guilty of . . . Five, Six and Seven."

Two of these three disputed counts involved conspiracies to assault two individuals with deadly weapons. (§ 245, subd. (a)(1).) Count 7 alleged that defendant and Frank Ruiz conspired with others between January 22 and October 27, 2008 to assault Henry Leyvas, while count 6 alleged that defendant, Ruiz, and another individual conspired with others between May 1, 2008 and April 23, 2009 to assault Daniel Cervantes. Count 5 did not allege a conspiracy, but simply that defendant had threatened his wife with great bodily injury or death between August 1 and 20, 2007. (§ 422.)

After the jury convicted defendant as charged and made a special finding that the five charged conspiracies "were separate and distinct," in bifurcated proceedings defendant admitted allegations of three prior convictions, one for attempted murder and two for possession of controlled substances. The attempted murder was a serious felony for which he had been tried separately and served a prior prison term. (§§ 667, subd. (a), subds. (b)-(i); 667.5, subd. (b); 1170.12.) Defendant had also served prior prison terms for the possession offenses. (§ 667.5, subd. (b); Health & Saf. Code, § 11370.2, subd. (c).)

---

[4] Counsel argued, "And I would submit to you that you could—anything that you can find him guilty of you could infer it was one[,] all one agreement to commit crimes for the benefit of the NF. [¶] But I think clearly as to Counts Two and Three, which I conceded, that it was one conspiracy, and it's because the allegations and the overt acts are an allegation that the [NF] established a street regiment to go down there and do that."

4

A separate indictment charged defendant with being a felon in possession of a weapon (count 1; § 12021, subd. (a)(1)) and ammunition (count 2; § 12316, subd. (b)) on January 8, 2007.  After the jury verdict, he entered a no contest plea to the weapon possession charge and admitted a strike allegation with the understanding that the prosecutor would dismiss the other charge and various enhancements and that defendant would receive a 16-month consecutive sentence for that offense.

After denying defendant's motion for a new trial, the court sentenced defendant to 40 years, 4 months in prison.  Components of that aggregate include the following consecutive terms doubled due to defendant's prior strike.

| Count | Term | Enhancements | Term | Totals |
|---|---|---|---|---|
| 3; conspiracy to sell methamphetamine | 10 years doubled upper term | § 186.22, subd. (b)(1)(A) | 4 years upper term | 14 years |
| 6; conspiracy to assault Cervantes | 1/3 of doubled 3 year midterm | § 186.22, subd. (b)(1)(B) | 1/3 of 5 years | 3 years, 8 months |
| 7; conspiracy to assault Leyvas | 1/3 of doubled 3 year midterm | § 186.22, subd. (b)(1)(B) | 1/3 of 5 years | 3 years, 8 months |
| 2; conspiracy to sell PCP | 1/3 of doubled 3 year midterm | § 186.22, subd. (b)(1)(A) | 1/3 of 4 years | 3 years, 4 months |
| 4; conspiracy to import drugs | 1/3 of doubled 3 year midterm | § 186.22, subd. (b)(1)(A) | 1/3 of 4 years | 3 years, 4 months |
| 5; criminal threat to wife | 1/3 of doubled 2 year midterm | § 186.22, subd. (b)(1)(B) | 1/3 of 5 years | 3 years |
| 1; active gang participation | 6 year upper term stayed | | | |
| 1A; weapon possession | 16 months | | | 1 year, 4 months |
| | | § 667, subd. (a) | 5 years | 5 years |
| | | H. & S. Code, § 11370.2, subd. (c) | 3 years | 3 years |
| | | § 667.5, subd. (b) | 2 years stricken | |

On count 3, the court selected the upper terms for the conspiracy and the gang enhancement based on defendant's leadership role, his criminal sophistication, and his performance on parole.

On appeal defendant contends that the trial court erred in allowing the jury to decide whether he was involved in five separate conspiracies as charged, or whether some or all of the charged conspiracies amounted to one overall conspiracy. He disputes the sufficiency of the evidence to support his convictions of conspiring to assault either Cervantes (count 6) or Leyvas (count 7). Most of his arguments are directed at his conviction of threatening his wife (count 5), namely that there was insufficient evidence of a criminal threat, that the evidence established at most an attempted threat because she was not frightened, and that the court should have defined causation sua sponte. Most of defendant's appellate arguments ask us to accept facts discounted by the trial court or the jury. Appellate counsel for both sides make some factual arguments not presented to the jury. For the reasons stated below, we will affirm the judgment.

## II. TRIAL EVIDENCE

The contentions on appeal do not require a thorough review of all the evidence presented in 16 days of testimony. We focus on the evidence relevant to the issues and arguments on appeal.

### A. *CONSPIRACIES TO SELL METHAMPHETAMINE (COUNT 2) AND PCP (COUNT 3)*

Evidence that defendant conspired to sell methamphetamine (count 2) and PCP (count 3) in association with the NF gang between April 25, 2002, and April 23, 2009 also proved his active participation in a criminal street gang (count 1). Several members of defendant's regiment and other NF regiments were among those who testified about the operation of defendant's regiment.

6

## 1. *Debbie Guzman*

Defendant's ex-wife Debbie Guzman testified that she first met him at a juvenile ranch when she was about 14 years old.[5]  He was a year or two younger.  In 1992 and 1993 she was convicted and imprisoned for possession of PCP.  Incarceration ended her addiction to PCP.

Debbie lost contact with defendant after her release from the juvenile facility until 2005.  Shortly after they met again he moved in with her.  His nickname is Lencho.  As they lived together, she learned of his gang involvement.  He always carried a lot of money and he eventually admitted to her he was involved in selling drugs.  He was on parole when they met.

They married in October 2005.  She enjoyed the status of being his wife.  He was treated as a minor celebrity in nightclubs.  After they married, defendant told her he was in Category II of the NF and ran the local streets.  He once said a wife could not testify against her husband.

Defendant sometimes brought her along when he picked up money and dropped off drugs.  She attended some of his meetings with leaders of other local NF regiments, including Charlie "Brown" Campa, Sammy "Black" Ramirez, and Marco "Red" or "Huero" Abundiz.  When defendant met with other regiment leaders, Ramirez talked about messages he had received from the NF leadership in Pelican Bay State Prison saying defendant had not been communicating with them and "hasn't paid his dues . . . ."

According to Debbie, defendant was supposed to be sending money orders to gang leaders incarcerated in Pelican Bay and in Colorado, but was not doing it.

---

[5]  We will refer to her by her first name to avoid confusion over common surnames, and not to show familiarity.  For the same reason we will do the same for other individuals, such as defendant's brother Greg.

Jack Ochoa supplied defendant with "ice," methamphetamine. Defendant taught Debbie how to package methamphetamine and PCP for sale. Defendant kept drugs at their house, but they packaged the drugs at his sister Stephanie's house. His son Danny and Stephanie helped. Stephanie used methamphetamine, while Debbie never did.

Debbie resumed using PCP with defendant in 2006. He received two ounces of PCP from Mario Cisneros every seven to 10 days. Cisneros brought the PCP in a Victoria's Secret bag and defendant kept the PCP in a pink cloth bag that Debbie got from Victoria's Secret. "[P]ink" became a code for PCP. Defendant provided PCP to Debbie, his brother Greg, and "Bear," among others. At trial Debbie could not remember "Bear's" real name.[6]

Before defendant went into custody, he said to Debbie that if she ever talked to the police, it would be the last time she talked.

According to Sergeant T. J. Lewis of the San Jose Police Department, defendant was placed in custody at the Santa Clara County Jail on March 8, 2007.

According to jail inmate John "Boxer" Mendoza, at the same time defendant arrived in jail, so did his codefendants Frank "Joker" Ruiz, a Nuestra Raza (NR) member, and Marco "Huero" Abundiz, a NF member.

The court accepted Mendoza as an expert on NF, NR, Norteños, and Northerners, both in prison and on the streets based on his gang history. Mendoza had spent his teenage years in a Northern gang in San Francisco. He became a NR member in 1989 and a NF member in 1994. Mendoza was also the commander of a NF regiment in San Jose in 2003 until his incarceration in June 2004. He became a Category III member after his arrest. It is the highest category in the NF organization below the generals.

_____

[6] Daniel "Bear" Cervantes was the alleged victim of the assault conspiracy in count 6. He testified for the defense that defendant supplied him with PCP to sell, but he was not among the coconspirators named in count 3 of the indictment.

Mendoza was testifying pursuant to a use immunity agreement as well as a plea agreement of September 9, 2008 resolving charges against him arising partly out of his regiment selling drugs, including conspiracy to sell methamphetamine, active gang participation, possession of heroin, and possession of marijuana for sale. Mendoza observed that in the Northern gang hierarchy, the NF was the leadership with NR, the "soldiers," beneath them and unaffiliated Norteños beneath them.

According to Correctional Deputy James Kirkland of the Sheriff's Office, all telephone calls from the Santa Clara County Jail are recorded, except for calls going to lawyers and the clergy. The inmates are notified in three different ways. During intake they sign a form acknowledging that phone calls can be monitored. Above the phones is a placard saying the same thing. And there is an oral warning at the beginning of every phone call. The maximum time for a call until the jail changed systems in 2010 was 15 minutes. The phone system was designed to prevent three-way calls, but inmates could thwart it by making certain noises into the phone.

The prosecution produced excerpts of 30 recorded telephone calls involving defendant and Debbie between the dates of March 8 and December 14, 2007. The defense produced excerpts of six other phone calls involving defendant and Debbie between the dates of August 16 and December 22, 2007. One was a more inclusive excerpt of a conversation on August 18. Not every recorded call was played for the jury while Debbie was on the witness stand.

In two early phone conversations on March 8, defendant warned Debbie to be careful because everything they said was being recorded. Debbie testified that in many of their phone conversations defendant was either telling her to arrange to have Clayton Clark available for the next telephone call or to contact different people and tell them she was collecting money for defendant. She could not keep track of the gang codes when she was high on PCP so it seemed he was always yelling at her.

9

The court accepted Sergeant Lewis as an expert in the areas of "Hispanic criminal street gangs, prison gangs, interpretation of gang terminology, gang codes, and the area of identification of possession for sale or sales of a controlled substance, and the area of recognition of usable amount of controlled substances." He testified that one of the NF principles was that NF business should not be discussed with any outsider, wife, or girlfriend, but the rule was not always followed. Mendoza testified that it was almost inevitable that wives of NF members were exposed to gang business.

## 2. *Clayton Clark*

Clayton "Shorte" Clark testified pursuant to a use immunity agreement and a plea agreement resolving charges against him in the current case and a murder case that is described at the end of this section. As a teenager he was involved with Norteño street gangs. When he was 17 he was involved in a Norteño gang called Westside Gardens. Clark began to learn about NF and NR when he went to jail for an assault with a deadly weapon. When he went to San Quentin Prison in 2000 after a domestic violence conviction, he was invited to join NR. While he was in prison, he was involved in removals, which usually involved one inmate slashing the face of a gang enemy, after which "the bombers step in with two people who physically assault the individual so the person that was slicing them can get away." Removals were always at the direction of gang superiors.

When Clark was in San Quentin Prison, as tier security and a block general for the NF he reported in writing to defendant, who was the NF Authority in Charge of the prison. They did not meet in person at the time. Clark did meet defendant's brother Greg "Joker" Guzman in San Quentin. Clark kept returning to prison after being released. During his third stint in prison, he got involved in selling methamphetamine that he obtained from visitors. Clark was paroled in October 2005.

10

Clark began associating with the San Jose Grande (SJG) Norteño gang and arranged their merger with Westside Gardens. In May or June 2006, Greg approached Clark about working in defendant's regiment. In July 2006 Clark approached defendant and proposed that the SJG gang would sell methamphetamine for him. Defendant gave him a quarter pound initially. The amounts of weekly methamphetamine increased from a quarter pound to a half pound up to four to five pounds a week. Frank "Manos" Gutierrez, an SJG member, was one of the people who worked under Clark. Clark dealt with four people, each of whom had a crew working for him.

Clark became second in command in defendant's regiment, which meant that Clark reported to him and took care of the drug sales. Clark was primarily responsible for the day-to-day operations of the regiment. It was Clark's responsibility to keep track of who owed money for the drugs Clark had fronted to them. Clark did not collect monthly dues from regiment members. Defendant and Clark obtained methamphetamine from Jack Ochoa.

Before defendant was arrested in March 2007, the regiment was selling from two to five pounds of methamphetamine a week. Once defendant was arrested, Clark was primarily responsible for keeping the regiment functioning and collecting drug debts owed the regiment.

Until defendant was incarcerated, he just provided Clark with methamphetamine, not PCP. Clark was aware that defendant was selling PCP he received from Mario. At defendant's request after his arrest, Clark arranged that Sammy Ramirez would sell 1.5 ounces of PCP that defendant had left behind.

In evidence were eight recorded calls involving defendant and Clark between March 16 and July 2, 2007. They sometimes spoke during a three-way call involving Debbie.

A telephone conversation on April 3, 2007 beginning at 10:36 p.m. became a three-way call. Defendant initially called Debbie. Debbie said that "Sheila" wanted to

11

get on the phone.  Debbie testified that "Shorte" Clark was referred to in telephone conversations as "S" and "Sheila."  After some conversation, Clark took the phone from Debbie.  Defendant asked Clark if he was done with the four "apartments."  Clark said they were close to "finishing the house."  Clark testified that was a reference to selling four pounds of methamphetamine.  Defendant told Clark to get his own telephone because defendant wanted to talk to "the brown guy . . . with that brown ride."  Clark said "the black guy was just at my house."  According to Sergeant Lewis, "brown" referred to Charlie Campa and "black" referred to Sammy Ramirez.  Clark said "the black guy" was always getting the "pink socks."  According to Lewis, that meant more people were interested in buying PCP.

Clark's assistance to defendant from outside jail was limited, as he was involved in a shootout at his apartment on July 29, 2007, that led to his relocation to Mexico.  A Sureño gang member who was the ex-husband of Clark's wife and an ally confronted Clark at home that evening.  When the ally produced a gun, Clark shot them both.  The shootings led to charges of murder involving personal discharge of a firearm and attempted murder involving personal discharge of a firearm causing great bodily injury, among the charges resolved by Clark's plea agreement.  That night, Clark got money from Charlie Campa and drove to Mexico with his wife.  Clark was arrested in Mexico and taken into custody at the Santa Clara County Jail in July 2010.  He was confirmed as a NF member when he returned from Mexico.

**3.  *Sammy Ramirez***

Sammy Ramirez testified pursuant to an immunity agreement and a plea agreement dated June 17, 2012 resolving charges arising from the criminal activities of his regiment, including conspiring to sell methamphetamine and PCP, active gang participation, assault involving a deadly weapon or force, and extortion.  Ramirez became a NR member in December 1995 and a NF member in September 1997.  He became the

12

secretary of Skip Villanueva, a high-ranking NF member. Ramirez became a Category II member in September 1998.

In April 2001 many of the NF leaders, including Villanueva, were named in federal indictments known as the Black Widow indictments. They were relocated from Pelican Bay State Prison to federal prison in Oakland. This led to a power struggle between the federal prisoners and NF members who remained in Pelican Bay.

When due for release from prison in March 2005, guards caught Ramirez with a kite that included a rewritten NF constitution and a message from Anthony "Chuco" Guillen, one of the NF generals in Pelican Bay Prison, regarding the loss of authority of the NF generals who had been relocated to federal prisons. According to Sergeant Lewis, a kite is a communication between inmates in microwriting. Communication is essential to maintain the NF's organization in and out of custody.

After his release from prison, Ramirez contacted regiment leaders Abundiz and Campa and formed his own regiment in Santa Clara County as he had been instructed by Guillen. His regiment sold more methamphetamine than PCP. For a period of time, Vince Tirri was Ramirez's second-in-command.

The regiment leaders gave themselves nicknames for telephone use: Ramirez was "Black," Campa was "Brown," Abundiz was "Red" or "Rojo," and defendant was "White." According to Ramirez, the four regiment leaders only met twice in person and Debbie was not in attendance. They called each other only about important matters like the prices of dope. Defendant's regiment was selling methamphetamine, PCP, and sometimes marijuana. Ramirez had Abundiz supply him PCP that he obtained from defendant. He did not deal directly with defendant because he heard defendant "was really hot."

Ramirez did not meet Clayton Clark until after defendant was arrested. After defendant was incarcerated, Ramirez contacted defendant's PCP supplier, Mario, and obtained PCP from him. Mario said he would make the same arrangements with Ramirez

13

that he had with defendant, "L," namely he would front him one, two, or three ounces at a time and he could pay a day later. Ramirez was arrested on February 20, 2008.

**4. *Antonio "Chuco" Guillen***

Antonio Guillen was not a witness, though he was described by several witnesses. Sergeant Lewis, Sergeant Livingston, and Correctional Officer Valdez testified that, at the time of trial, Antonio "Chuco" Guillen was the general in Pelican Bay State Prison in charge of NF street regiments.

There was testimony about Guillen's communication with leaders of other NF regiments. Valdez and Ramirez testified that Guillen was the author of a kite that Valdez took from Ramirez in March 2005 that pertained to the entire NF organization. Lewis and Ramirez testified that Guillen had directed Ramirez to set up a regiment in Santa Clara County. Livingston and Valdez testified that Guillen was in contact with regimental commander James Cramer in October 2005 and that Cramer reported to Guillen. Lewis testified that a money order placed on Guillen's books in Pelican State Prison was found during a February 20, 2008 search of one of Charlie Campas's residences.

Mendoza described what he considered to be an indirect communication by Guillen to defendant. Mendoza believed that Paul Lopez was the real author of a letter purportedly from his wife Norma to defendant postmarked February 21, 2008. According to Mendoza, at the time Guillen was pulling Paul into the NF, so they were communicating. In the letter were the statements: " 'Debbie's sister was given the house and kids when Debbie last moved out, so that should be respected. As far as he is concerned, there should be no problems with Debbie and PJ helping out with some of the chores around the house when necessary. The girls got to learn how to clean house and learn to live and work together.' "

14

According to Mendoza, this was a coded message saying that defendant was the regimental commander of the Santa Clara County Jail and that Paul Lopez ("PJ") and Rudy Miramontes ("Debbie" or "Dancing Bear"), a NF member, should work with him in that capacity. The letter also referred to Ramirez as "on freeze" and Mendoza as " 'no good.' " Mendoza understood the letter to be relaying Guillen's instructions.[7]

## 5. *NF Dues*

Sergeant Lewis acknowledged that he had not encountered a regiment bank containing large amounts of money. However, he testified that "it's all about money. That's really what it all comes down to when you're talking about [NF]. In the end it's all about money, and how they go about it. And then at the end they send money, in theory, they send money to incarcerated members, and they carry out directives coming from inside of the institution." He explained that regiment members "[i]n theory" had to pay the regiment monthly dues of $200. Lewis equivocated on cross-examination, saying that some regiments charge a higher price for narcotics in lieu of collecting $200 monthly dues. Sergeant Livingston testified that his investigation of the James Cramer regiment produced a document listing regiment dues and also a money order sent to a high ranking NF member in Pelican Bay.

Sammy Ramirez testified that every member in his regiment had to pay $200 a month whether Ramirez provided them with drugs or not. He explained to them that it was like an insurance policy, backing their collection of drug debts with NF's reputation for violence. Pursuant to a use immunity and a plea agreement described below (in part II.D.1), Vince Tirri testified that when he served as second-in-command of

---

[7] On appeal the Attorney General relies on this letter, written almost a year after defendant's incarceration, as Guillen's authorization of defendant as the regimental commander of the jail. There was no evidence of a reciprocal communication from defendant to Guillen. The prosecutor did not mention this letter in closing argument.

15

Ramirez's regiment, one of his duties was collecting monthly dues. Tirri testified that he paid dues when he was a member of Charlie Campa's regiment. Mendoza said the purpose of his regiment in 2003 and 2004 was "making money for the NF" primarily by selling methamphetamine. "[I]f we're out there selling drugs, it's supposed to be 25 percent of anything that we bring back, it goes back to the organization off the top. You're to pay $200. It's commission monthlies, they call them monthlies on every member of the regiment is to pay $200, and it goes back to the main bank plus the 25 percent." According to Mendoza, that obligation existed for all regiments throughout Northern California.

## B. *CONSPIRACY TO SMUGGLE DRUGS INTO JAIL (COUNT 4)*

The evidence of a conspiracy to smuggle drugs into the Santa Clara County Jail between January and June 1, 2007 was primarily seven recorded telephone calls, all on April 26, 2007.

Shortly after 1:00 p.m., Cindy Mendoza was involved in two concurrent phone calls on different telephones, one with defendant and the other with his brother Greg, Cindy's boyfriend. At the time, Greg was housed in an area of the jail known as the snake pits, along with David "Pookie" Bermudez and Aldo "Droopy" Martinez.

Cindy told defendant that Greg was going to talk to Pookie. Defendant said to "let . . . fat ass know . . . that . . . it's for us." Greg said Droopy was going to cover it. Somebody's wife was going to bring it to the guy who takes it in. Defendant said he was putting something else in, "a little moon stuff." Greg said he wanted some for himself. According to Sergeant Lewis, "moon stuff" meant PCP. Greg called Cindy 15 minutes later and said Droopy was going to call her shortly.

At 1:36 p.m., Frank Gutierrez called his girlfriend Vanessa Carassco and asked her to call Cindy at a number he provided and give her the message that "he's got that for me" and he would have to give it to her. At the time, defendant and Gutierrez were

16

housed together in 2nd East Max. Gutierrez called Vanessa again around 3:15 p.m. to finish delivering the message. "She" would direct her where to go and it had to be done today. Lewis said it was common to have NR members like Gutierrez pass along messages from NF members. Gutierrez called Vanessa a third time at 3:45 p.m. He had another message from "Junior," a nickname for defendant. "S" was going to be calling her and bringing her the moon stuff.

Finally at 8:36 p.m. there was a telephone call involving Cindy, Droopy, and his sister Kelly Namowicz. Droopy told Cindy that Kelly would be calling her the next day.

Debbie testified that she provided methamphetamine and PCP to Cindy at Cindy's request so that she could give them to Greg, who was in jail. Defendant later told Debbie he was upset because he was supposed to receive the drugs, but Greg got caught with them.

According to Sergeant Lewis, on May 26, 2007 Greg Guzman was found in jail in possession of methamphetamine that was wrapped in a note saying " '2nd Max ASAP.' " Also according to Lewis, gang members would never bring drugs into jail just for personal use. They would want to make money on it.

## C. *CRIMINALLY THREATENING DEFENDANT'S WIFE (COUNT 5)*

Count 5 alleged that between August 1 and 20, 2007, defendant willfully threatened a crime that would have resulted in death and great bodily injury to his wife Debbie with the specific intent that the written statement was to be taken as a threat, even if there was no intent to actually carry it out, which, on its face and under the circumstances in which it was made was so unequivocal, unconditional, immediate, and specific as to convey to Debbie a gravity of purpose and an immediate prospect of execution of the threat and caused her reasonably to be in sustained fear for her own safety.

17

Defendant once told Debbie about a situation in the 1990s when one of the wives got killed for talking after several gang members got arrested for drug sales. However, count 5 was not predicated on that conversation, but on a letter from defendant to Debbie postmarked August 15, 2007 that included the following passage. "My one and only, my sometimes difficult one and only, but, nevertheless, she's mine and I love her to death and I mean that literally. Because if my baby does me wrong, death going to part us. You better ask somebody." It ended, "Love you, always, your husband."[8]

Debbie admitted at trial that when she received the letter, "at the time I didn't take it, like, real serious because I never thought that I was going to turn on him. I always thought I was going to be with him, so I wasn't really afraid at that time."

She brought up the letter twice in contemporaneous telephone calls with defendant. In a conversation on August 16, Debbie said, "I got your—your funny letter today." When he asked which one, she said, "I got that one where you're so funny, 'when death,' well, 'when death does us part,' or something, and 'you better ask somebody.' [Laughs] I started rolling. I said [']he's hilarious huh?['] Shut the hell up. You know you ain't gonna do shit." Defendant laughed. Debbie said she would put him out if he went out on her "[a]nd you'd better ask somebody." Defendant said he did not have to worry about that now and the conversation turned to her suspicions about him writing letters to other women. She told him, "if you fucking write that ho back your fucking dick will be up your ass." While defendant laughed, she continued, "Ass kicking, you can ask somebody." He continued to laugh. She told defendant that her young son had overheard her and complained about her language.

---

[8] The letter (Exhibit 168) does not appear in the record on appeal. This passage has received differing punctuation in various quotations in testimony and motions, so we have settled on punctuation that makes sense to us.

During a conversation on August 18, Debbie said she wished she could feel defendant.  When he chuckled, she said "Yeah I do, literally, I mean that.  Like you said in your letter, I'm like whatever, I mean that."  She asked, " 'Cause I know you, babe, would you really do that?"  He asked what and she answered, "The [']literally['] part."  "What you wrote in that letter.  You would not."  He again asked what she was talking about, and she reminded him of the "literally" part of a letter.  This dialog followed.

"[Defendant]  [']Do us part.[']

"[Debbie]  Yeah[.]

"[Defendant]  [Laugh]

"[Debbie]  You would not.

"[Defendant]  Shit.

"[Debbie]  Not me?

"[Defendant]  Yeah, you.

"[Debbie]  Why me?

"[Defendant]  Because you're the only girl that I love . . . ."

She said she wouldn't do that, and defendant asked if she was getting cold feet.  She stated, "I said I wouldn't do that, you dork.  Do you know what 'wouldn't' means?"  Debbie asked if defendant remembered how she was always cold and if he would like to have her body on him.  The conversation turned to sex.

On December 17, 2007, the police conducted a search of Debbie's residence while she and her housemate, Leslie Frost, defendant's cousin, were present.  Sergeant Lewis

19

and Sergeant Dan Livingston of the Campbell Police were both involved with the search.[9] Lewis told Debbie that she had been indicted and might lose her son if she went to prison instead of cooperating with the police. She initially denied any involvement in distributing drugs. Lewis said he did not believe her based on the recorded telephone calls. Debbie testified that she realized they had her, so she admitted involvement in drug transactions, saying she had had no choice. Debbie was concerned about giving information to the police with Frost present, as Frost would have notified defendant.

On December 18, Debbie told defendant during a telephone call that the police raided the house the day before and had torn the house apart and taken all their letters and pictures and computers. She read him the search warrant.

That day Debbie went to the office of the investigators and agreed to cooperate. Debbie agreed to record phone calls with a digital recorder. Lewis offered her witness relocation and no charges for her cooperation.

While Debbie testified that she was not immediately concerned about the August 15 letter, she did not forget about it either. When she agreed to cooperate with the police after her residence was searched, she told Sergeants Lewis and Livingston that she had a letter from her husband threatening to have her killed if she cooperated. At that moment, the threat became very real. According to Lewis, Debbie kept bringing up a threatening letter. It was seized during the search of her residence but not identified until a day or two later.

In evidence was a December 22 telephone conversation in which Debbie and defendant each professed their love for the other. Defendant encouraged her to be more independent because he was not able to be there for her. She asked him not to leave her.

---

[9] The court recognized Livingston as an expert in the area of Hispanic gangs, including NF.

He said, "I'm not going to, that's what I'm not gonna do. If anything, you're gonna leave me."

According to Sergeant Lewis, when Debbie began cooperating, she spoke with two intermediaries of Clayton Clark, one named Anthony Solis and his cousin Moses Rodriguez. Solis is a member or associate of the SJG criminal street gang in which Clark was involved. Solis called Debbie on January 8, 2008 and met with her the next day. She recorded their conversation. Solis had a written message for defendant from Clark. Solis said he was going to be making payments to her.

On January 18, Debbie called Rodriguez. He said he would be paying her money for defendant. He asked why she had not disclosed that the police had searched her house. After that conversation, she called Lewis and said she was afraid of being exposed as cooperating with law enforcement. Lewis told her to stay in a hotel overnight. The next day, Lewis told her to act like the wife of a NF member. Debbie called Rodriguez and challenged the way he had questioned her. Rodriguez backed off a little, according to Lewis, who had listened to a recording of the call. When they met later that day, Rodriguez paid her $100. In later phone calls Debbie asked Rodriguez to put her in contact with Clark, who was in Mexico.

Clark called Debbie on February 5, 2008. She asked if "those kids" had given Clark her messages and he answered yes. She said defendant thought Clark was ignoring them. She told him that Rodriguez had called her drunk one day. "[H]e was acting smart and he was acting rude and he was like saying how come you didn't tell us your house got raided . . . ." She said she told Rodriguez she had to report to defendant, not to him. Clark said he had asked Rodriguez to ask her what happened. Debbie said defendant was mad about how Rodriguez had confronted her. Clark said he was interested in hearing from Jack Ochoa and wanted him to call one of his "kids."

Debbie had another telephone conversation with Clark on February 16. Clark said his boy had not heard from Ochoa yet. Debbie said she would tell Ochoa to call.

21

Sergeant Lewis and Debbie had differing recollections about why he decided to relocate her on February 18, 2008. According to Lewis, while they were meeting, he noticed a car circling them and looking intently at them. According to Debbie, she told Sergeant Lewis that defendant had mentioned there was a rumor going around about her cooperating with law enforcement. She had told him that he could believe what he wanted, but it wasn't true. During her next meeting with Sergeant Lewis, he told that that she had to relocate that night.

On February 19 Debbie had a recorded telephone conversation with Jack Ochoa. They reminisced about how Ochoa used to sell a cut pound of methamphetamine to defendant for $6,500, but he said no one wanted cut stuff anymore and a pure pound cost $20,000.

Soon after that conversation, Lewis put Debbie and her son into a witness protection program. Debbie acknowledged that the program had helped her with expenses for relocation, rent, meals, utilities, and emergency medical care. She transitioned out of the program in September 2010 and stopped receiving financial assistance.

Debbie testified that she knows what defendant is capable of. Every time she returns to Santa Clara County she fears for her life. Her fear of something happening to her or her son would not end with the end of defendant's trial. "It's never going to end. I'm going to have to stay gone. It will never end."

**D.** *CONSPIRACIES TO ASSAULT DANIEL CERVANTES (COUNT 6) AND HENRY LEYVAS (COUNT 7)*

The indictment charged that defendant conspired to assault Leyvas between January 22 and October 7, 2008 and Cervantes between May 1, 2008 and April 23, 2009 (the date of the indictment).

22

**1.** *Daniel Cervantes*

Cervantes testified for the defense that he was a Northerner who had known defendant for over 25 years. Cervantes has been in and out of jail and prison since 1987 and involved with PCP since 1990. Before his incarceration in 2007, he sold methamphetamine and PCP. Defendant occasionally fronted him drugs, though Cervantes was not functioning as part of a regiment.

Cervantes acknowledged that defendant had once fronted him a quarter pound of methamphetamine that Cervantes was unable to sell. Someone retrieved the methamphetamine from Cervantes on defendant's behalf. Defendant told Cervantes he owed him $400 because the returned methamphetamine was short.

During a recorded call on December 14, 2007, before Debbie agreed to cooperate with law enforcement, she asked defendant if he remembered his friend "Bear," for whom he had done tattoos. She told him his cousin Leslie had said she had encountered Bear the night before and he admitted owing for a tattoo. Defendant said, "Yeah, like four." Leslie had said she would collect it for him.

Debbie testified she had accompanied defendant when he tried unsuccessfully to collect the debt. She had also tried unsuccessfully to collect the debt from "Bear" at defendant's request. Defendant had also sent Carlos Roman to collect on the debt.

After agreeing to cooperate with law enforcement, on January 16, 2008, Debbie recorded a telephone call she made to Leslie. Debbie said defendant was wondering if she ever got the money. Leslie said that Bear told her he had moved to Modesto and would call her back and, when she called him two days later, his phone was disconnected. Cervantes said he should have handed "it" directly to defendant instead of to Roman, because defendant said it was short. Debbie pointed that that both Bear and Roman were users. Cervantes still acknowledged it was his fault. Debbie commented, "all that drama

23

just over $400." Debbie said that defendant was eager to get the money. On February 12, 2008, Debbie called Leslie again and learned she had not heard from Bear.

According to jail records, Cervantes was taken into custody on May 1, 2008. On May 14, he was sent to a jail unit in Elmwood. He spent time in two other units in Elmwood before being released from custody on September 21, 2008.

The key documentary evidence of two conspiracies was a single kite (Exhibit 412) that was dated October 21, 2008 and signed by "C/R Calpolli." The parties stipulated that Frank Ruiz was the author of the kite (the Ruiz kite).

The Ruiz kite, addressed to the Elmwood facility, was intercepted and brought to the attention of Dennis Gillotte, a Correctional Deputy for the Santa Clara County Sheriff's Office. Based on Gillotte's employment in jail classification and jail intelligence the court accepted him "as an expert in the area of prison street gangs operating in Santa Clara County Jail."

Gillotte testified that the kite identified its origin as from the "AIC" of "SCCJ MJN 4-B," which stood for Santa Clara County Jail, Main Jail North Unit 4-B. Ruiz was the NF's authority in charge at the time. According to jail records, defendant was housed in 4-B3 from July 11, 2007 through November 4, 2008. Frank Ruiz was housed in 4-B3 from July 11, 2007 through July 22, 2009.

Ruiz testified for the defense that after he was incarcerated in 2007 in the Santa Clara County Jail, he learned that defendant was the overall jail authority. In 2008, Ruiz became the authority in charge of the jail for the NF and "Calpolli" was his "Cana" code. "Cana codes" were gang codes used to confuse prison staff. He worked under defendant when they were both in 4-B3.

The Ruiz kite described a dispute at Elmwood concerning who was in charge and a Northerner who was falsely claiming to have the higher status of a NF member. Based on disarray in Elmood, the kite directed recipients to file reports of rosters and incidents

24

as soon as possible at 4-B, where Ruiz and defendant were housed. The kite complained that reports "using only Cana codes" did not identify the authors.

The kite also stated, "'Also concerning Bear Cervantes. He's been deemed no good. Thus his removal was just.'" "'There's also a registered sex offender in M-8. I believe his name is Henry Leyva. He's to be dealt with ASAP.'"

According to Sergeant Lewis, a NF member who is "deemed no good" by a gang member is subject to violent assault by other NF members. Such a decision must be made by the highest gang authorities in Pelican Bay unless the authority is delegated to a local NF member. It means you are in bad standing with the organization. In contrast, being put "on freeze" means the gang was looking into your gang credentials. A member on freeze is still active, but should not be informed about current gang business.

John Mendoza testified that a "bad news list" is a list of everyone who has been deemed no good. They are all considered enemies of the gang. Any NF member can put someone on the bad news list. So long as a NF member was present in jail, a NR member could not put someone on the bad news list. Within a prison or county jail, the regimental commander has the authority to deem someone no good. It would be against protocol to delegate that authority. It is the commander's responsibility to conduct an investigation before deeming a person no good. A NR member who was the second in command would not have the authority to deem someone no good. "So he's just relaying information that has been related to him. He's not authorized to make those kinds of decisions himself." If a person was deemed no good, a gang member would be obligated to remove that person with a weapon at the first opportunity.

After seeing the Ruiz kite, Officer Gillotte determined that "Bear" Cervantes was Danny Cervantes. Gillotte attempted to locate Cervantes, but he was not in custody. Cervantes was returned to jail on January 30, 2009. He was housed in Main Jail North 4-B1 and then 4-B3, a single cell, until February 27, 2009. In some cases inmates with a

25

problem with NF are placed in 4-B3 to determine their status with the NF. On February 27, Cervantes was placed in protective custody.

Vince Tirri, a member over time of the Campa, Mendoza, and Ramirez regiments, testified pursuant to a use immunity and a plea agreement resolving charges of active gang participation, conspiracy to sell methamphetamine, and two counts of forcible assault with a gang enhancement. Tirri became a NR member in April 2001.

Tirri was arrested in October 2006. He was brought to the Santa Clara County Jail in August 2007 to face a charge. Tirri learned that defendant was the regimental commander of the jail. Tirri was housed on 2nd East Max. As defendant was housed on the fourth floor, when Tirri met defendant at medical, they discussed the status of everyone in 2nd East Max.

In 2009, Tirri and defendant were housed together in administrative segregation. There were four cells. In the other two were Frank Ruiz and Marco Abundiz. Defendant told Tirri all about Cervantes. Defendant had fronted a quarter-pound, four ounces of methamphetamine to Cervantes. Carlos Roman brought the drugs to Cervantes and went to retrieve them when Cervantes failed to act. When the drugs were returned to defendant, an ounce was missing. When defendant questioned Cervantes, Cervantes said he had received it that way and had not weighed it. Roman said he had not touched it. Defendant did not believe Cervantes and believed Cervantes was hiding from people trying to collect on defendant's behalf. Defendant said he had deemed Cervantes no good. According to Tirri, if a gang member did not remove someone who had been deemed no good, the gang member could potentially be removed.

According to Tirri, Ruiz told Tirri that Cervantes had been removed.

Gillotte was not aware that Cervantes actually had been removed by an assault. Cervantes testified that he was never assaulted while in jail before he bailed out in September 2007 or when he returned. Four hundred dollars was a small amount of money and it would not have created a problem between defendant and him. When he returned

26

to custody in January 2008, he was told he needed to get to the fourth floor and he was housed in 4-B, where he met Frank Ruiz. Cervantes explained to Ruiz he had not gone into protective custody. Ruiz told him not to worry about his debt to defendant, just to pay it when he got out. Ruiz said he would be on freeze, but not deemed no good. Cervantes admitted that he would not testify against defendant due to fear of retaliation and that he had received defendant's written permission to testify.

Testifying for the defense, Ruiz corroborated Cervantes's version of their conversation in 4-B. Ruiz testified that he wrote the kite on his own initiative. According to Ruiz, another kite had arrived in August 2008 that put defendant and Ramirez on freeze, leaving Ruiz in charge of the jail. Ruiz destroyed that kite. Ruiz said that he was in charge of the jail though there were other active NF members in jail who were not on freeze. Ruiz wrote that Cervantes' removal "was just" based on a false impression from incident reports from Elmwood that Cervantes had already been removed. It was not based on the debt owed defendant. Defendant had never discussed Cervantes with him.

Ruiz heard in January 2009 that defendant was no longer on freeze. Ruiz conceded that it would violate gang rules to testify against a fellow gang member like defendant.

### 2. *Henry Leyvas*

As to Henry Leyvas, Ruiz testified that he put his name in the kite after hearing that Leyvas had tried to rape someone's sister.

According to Sergeant Lewis, a sex offender living in a gang member's area in jail could be assaulted without anyone's prior approval.

According to gang expert Valdez, when an inmate comes to an institution, the prison gang will ask for the inmate's paperwork. They want to determine their gang credentials and keep out inmates charged with sex crimes. The NF gang will assault an

inmate on a yard who is a sexual registrant or has sex crimes to remove them from the yard. Sureño and white gangs also assault sex offenders.

According to Mendoza, sex offenders are not automatic gang targets. Their paperwork should be reviewed. There has to be an incident report explaining any assault.

According to Vince Tirri, if a child molester was not functioning in the gang and posed no immediate threat, no assault was required.

According to Frank Ruiz, there is no protocol to removing sex offenders. No one has to approve it even if the offender is a NR member. He did not investigate the claim that Leyvas had tried to rape someone's sister. Ruiz acknowledged that judgment was involved, for example, if the crime was statutory rape.

Officer Gillotte understood the directive about dealing with Leyvas to mean he was to be assaulted at the first opportunity. Most sexual offenders are placed in protective custody on a case-by-case basis. There is a standing order for the gang to assault a sex offender who is housed with a gang.

Gillotte spoke with Leyvas about going into protective custody. He did not want to go at first but he was placed in protective custody.

Ruiz testified that he pleaded guilty to conspiring to assault Leyvas with a deadly weapon because he wrote the kite and ordered it. He asked for the allegation against defendant to be deleted because defendant was not involved.

## III. ANALYSIS

### A. NUMBER OF CONSPIRACIES

On appeal defendant contends "the trial court should not have instructed the jury to determine whether there existed multiple conspiracies or one single conspiracy, but should simply have consolidated the conspiracy counts into one single count" as the defense had requested. "[T]he evidence in this case shows only one conspiracy, not the six separate conspiracies charged by the indictment." We assume that defendant is

28

referring to the five conspiracies described in his summary of counts 2, 3, 4, 6, and 7 of the indictment. His implicit premise is that the trial evidence as a matter of law proved the existence of one overall conspiracy that involved the commission of the five separate crimes. Before deciding this issue, we will review its procedural history.

1. *Procedural History*

Before trial, in a motion to set aside the indictment defendant contended that "Counts 2, 3, 4, 6 and 7 should either be set aside or consolidated into one single conspiracy count" instead of being pursued as separate conspiracies. Defendant asserted the incongruity of the prosecution alleging multiple conspiracies while also arguing that many hearsay statements by different individuals were admissible as statements of coconspirators in support of a single conspiracy. The prosecution replied that it was not abandoning the allegation of separate conspiracies by use of the shorthand term "conspiracy." The section 995 motion was denied on July 9, 2010.

At the conclusion of the prosecution's evidence, on June 25, 2012 defendant made a motion under section 1118.1 based on a refused instruction he had proposed dealing with the issue of single versus multiple conspiracies.[10] He asked for the court, in advance of submitting the case to the jury, to either dismiss counts 2 and 3 or consolidate them into a single count. Defendant asserted that every single witness had testified that there was one conspiracy to sell methamphetamine and PCP. "[T]he only possible inference [is ]that there was one conspiracy to establish a street regiment to distribute drugs, PCP

---

[10] The instruction purportedly requested by defendant and refused by the court does not appear in the record on appeal. Defense counsel paraphrased it as saying, when a single agreement contemplates the violation of several Penal Code statutes like distribution of methamphetamine, distribution of PCP or other things through subagreements or subconspiracies to accomplish the objective of the agreement, it counts as a single conspiracy.

and methamphetamine." The prosecution responded that some former codefendants just sold methamphetamine, while others just sold PCP, and yet others sold both, so there was evidence of different conspiracies and separate and distinct violations of different statutes.

The court denied defendant's motion, explaining: "What is clear, however, is that this Court has a sua sponte duty to instruct in this area when there was sufficient evidence to support either finding either a single or multiple conspiracies, and I believe that the record is replete with evidence to suggest either theory. So based on that, I am going to give the instruction, but the *Meneses*[11] case clearly states that the issue is an issue of fact and not an issue of law. It's not an issue of law. The Court doesn't determine whether it's a single or multiple conspiracy as a matter of law. That's a fact that ought to be decided by the jury."

Accordingly, the court instructed the jury in terms of CALJIC No. 17.05 as follows: "The Defendant is accused of committing the crimes of conspiracy in Counts 2, 3, 4, 6 and 7. [¶] After determining all of your verdicts according to my instructions[,] you should sign all verdict forms on which you unanimously agree. If you have found the Defendant guilty of more than one coun[t] of conspiracy, you must then determine whether there was one overall conspiracy to commit multiple crimes, or whether there were separate conspiracies. You should consider all of the applicable evidence and determine this issue. [¶] When a single agreement to commit one or more crimes is evidenced by an overt act, the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objectives. Whether the object of a single agreement is to commit one or many crimes, it is in either case the agreement which constitutes the crime. One agreement cannot b[e] taken to be

_____

[11] *People v. Meneses* (2008) 165 Cal.App.4th 1648.

30

several agreements and hence several conspiracies simply because it envisions committing more than one crime. [¶] However, if you find beyond a reasonable doubt that there was not one overall agreement, but separate agreements, each accompanied by an overt act, then separate conspiracies have been established. [¶] If you find the Defendant guilty of more than one count of conspiracy, you will then include [a] finding as to whether there is one overall conspiracy or separate and distinct conspiracies."

Pursuant to this instruction, in addition to finding defendant guilty of the conspiracies alleged in counts 2 (to sell methamphetamine), 3 (to sell PCP), 4 (to smuggle a controlled substance into a penal institution), 6 (to assault Daniel Cervantes with a deadly weapon and 7 (to assault Henry Leyvas with a deadly weapon), the jury made a special finding that these five conspiracies "were separate and distinct."

After the jury's verdict, in a sentencing memo and a motion for new trial defendant asked the trial court, among other things, to set aside the jury's separate conspiracies finding and to find "that counts 2, 3 and 4 were one single conspiracy to sell and distribute drugs for the organization." He also asserted, "the evidence suggests that the acts alleged in counts 2, 3, 4, 6, and 7 were all part of one big conspiracy to benefit, promote, and make money for the Nuestra Familia organization, and enforce gang rules and discipline." The prosecution opposed this request. At a hearing on March 15, 2013, defendant argued that if all the conspiracies were not part of one overall conspiracy, at least the drug sales were. The trial court denied defendant's new trial motion, explaining: "[T]his Court heard a number of arguments from Counsel regarding the single versus multiple conspiracy. The issues were brought before the jury. There is a replete record from which there is a sufficient basis in which a jury did make their findings, so the request to grant a new trial or modify the verdict is denied at this time."

31

## 2. *Existence of One Overall Conspiracy*

Defendant asserts, "the entire thrust of the prosecution's evidence in this case was that all of the drug sales shown, both inside and outside the jail, as well as the planned assaults on Cervantes and Leyvas, were conceived and controlled by the [NF] and its members and agents, and all had the common purpose of furthering the success of the [NF] by generating revenue and disciplining [NF] members, Nuestra Raza members and Nortenos so as to assure that the [NF] rules were followed." Defendant asserts that in finding true the gang enhancements, the jury "believed all the charged offenses were committed for the benefit of the gang."

A conspiracy is usually regarded as continuing until the target offense is committed unless it is frustrated or abandoned. (*People v. Hardy* (1992) 2 Cal.4th 86, 143.) It is a question for the fact-finder to determine when a charged conspiracy has ended, "considering the unique circumstances and the nature and purpose of the conspiracy of each case." (*People v. Saling* (1972) 7 Cal.3d 844, 852.) As this court has said before, "a conspiracy can have multiple criminal objectives." (*People v. Jasso* (2006) 142 Cal.App.4th 1213, 1222 (*Jasso*); cf. *People v. Johnson* (2013) 57 Cal.4th 250, 266.) It is up to the conspirators to establish the primary goal or goals of the conspiracy. An agreement to commit a series of crimes incidental to a single objective may amount to but one conspiracy. (*People v. Vargas* (2001) 91 Cal.App.4th 506, 555 (*Vargas*).)

Defendant has relied heavily on this court's *Vargas* opinion to support his conclusion that only one conspiracy has been proved.[12] In that case, the defendant was charged with one conspiracy to commit multiple crimes, a conspiracy that alleged 96

---

[12] Defendant has also cited other opinions discussing what might be called umbrella conspiracies involving the commission of several crimes. As they do not involve criminal street gangs in general or the NF in particular, we see no need to distinguish each factually, as the Attorney General has done.

32

overt acts.  (*Vargas*, *supra*, 91 Cal.App.4th 506, 517-518.)  There was evidence at that trial that "[t]he Nuestra Familia (NF) is a prison gang that was founded in September 1968 by inmates at the California State Prison San Quentin (San Quentin).  NF is a 'cold-hearted gang' that commits murders, burglaries, extortion, and other crimes, including selling drugs to raise money for its members."  (*Id.* at p. 518.)  One objective of the NF is " 'to build the organization on the outside, become self-supporting, work with those in alliance, any and all illegal ventures to build the funds that can be utilized to take care of members behind the walls or drug deals on the streets.' "  (*Id.* at p. 519.)  NF members on the street were expected to contribute money to the NF " 'bank,' " which was the NF fund held for the benefit of the NF members.  The contributions from individual members were to be made from dealing drugs or getting " 'contributions' " from drug dealers.  The NF members on the " 'street' " were under the control of the Regional Security Department (RSD) to whom they were to report.  (*Ibid.*)

On appeal Vargas argued that the trial court deprived him "of his state and federal constitutional rights to a trial by jury and due process by failing to instruct the jury to determine the essential factual question whether one or multiple conspiracies existed." (*Vargas, supra,* 91 Cal.App.4th at p. 549.)  This court recognized that "[a] trial court is required to instruct the jury to determine whether a single or multiple conspiracies exist only when there is evidence to support alternative findings."  (*Id.* at p. 554.)  However, this court rejected Vargas's contention, stating, "Assuming that more conspiracy counts could have been charged under the facts, the decision to charge defendant with only one conspiracy count was a prosecutorial charging discretion that we do not review.  The exercise of that discretion involves questions of prosecutorial policies and judgment, not questions of fact for the jury to determine."  (*Id.* at p. 553.)  Moreover, this court did not recognize any prejudice to defendant being charged with one conspiracy instead of multiple conspiracies.  (*Ibid.*)

33

Finally, in a passage quoted by defendant, this court stated: "In fact, the record evidence points only to one conspiracy—the agreement to establish the NF as a criminal gang to commit murder, robbery, burglary, extortion, and drug trafficking, among other crimes. Within that umbrella conspiracy were subconspiracies to commit specific crimes. However, the commission of the specific crimes, and the drawing up of plans required to commit them, were all in pursuance of the overriding purpose of the NF, which was to establish power through the use of crime, force, and fear, and to use that power to further strengthen and perpetuate itself by killing its enemies, raising money for the gang, and instilling obedience and discipline among its members by killing members who break its rules. Thus, Rosas was killed because he had 'snitched on Pablo Pena, Panther.' The decision to kill Rosas, being one in furtherance of the overriding purpose of the conspiracy, was part of the overall conspiracy, and hence cannot be the basis for filing a separate charge of conspiracy." (*Vargas, supra,* 91 Cal.App.4th at p. 553.) Defendant's reply brief quotes additional, similar discussions in *Vargas* of how the NF functioned at the time.

Since that decision, the California Supreme Court has recognized that the appellate courts are divided about whether the number of conspiracies proved is a factual question for the jury. (*People v. Williams* (2015) 61 Cal.4th 1244, 1270 (*Williams*).) One of the cases cited as favoring presenting the issue to a jury was this court's opinion in *Jasso*, *supra*, 142 Cal.App.4th 1213. *Williams* determined that when separate conspiracies are not alleged, though conspiracy is a theory of culpability, the jury need not be instructed to agree on whether there was a single or multiple conspiracies. (*Williams, supra*, at p. 1272.)

*Jasso*, which involved three conspiracy counts, relied on the *Vargas* dictum and concluded "that the court erred in failing to instruct on single versus multiple conspiracies." (*Jasso, supra*, 142 Cal.App.4th at p. 1223.) The trial court in this case relied on *People v. Meneses, supra,* 165 Cal.App.4th 1648, which followed "*Jasso* in

34

holding that a trial court is required to instruct the jury to determine whether a single conspiracy or multiple conspiracies exist when there is evidence to support alternative findings" in a case involving nine conspiracy counts.  (*Id.* at p. 1671.)

The Attorney General characterizes some of the statements in *Vargas* as dicta that "should be considered in the light of the specific facts of the case."[13]  Defendant disputes this characterization.

We consider *Vargas*, *supra*, 91 Cal.App.4th 506 to have been a unique case factually where the prosecution's evidence of one overall conspiracy was apparently so compelling that no reasonable juror could have found the existence of more than one conspiracy.  In that case, tried in early 1997 (*id*. at pp. 539, 543), various NF members testified about the organization and its criminal activities between approximately 1989 and 1993.  (*Id.* at pp. 520-529.)

No matter how compelling the proof was in the 1997 trial in *Vargas*, the resulting appellate opinion does not prove a single fact in this case.  The evidence in that case focused on NF activities between 1989 and 1993.  The evidence in this case focused on defendant's conduct as a NF member between April 2002 and April 2009 and his conduct on the street until his March 2007 arrest.  *Vargas* discussed an organizational structure involving a Regimental Security Department that appears to have been superseded by having individual regimental commanders reporting directly to the Pelican Bay NF generals.  There was testimony in this case that the NF constitution was revised in about 2005.

---

[13]  The Attorney General also explains how federal decisions have differentiated " 'vertical' " or " 'chain' " conspiracies from " 'hub and spoke' " conspiracies, while acknowledging the distinction "is of only limited value in determining whether an illegal drug distribution network is one or more conspiracies."

35

A more significant factual difference is that *Vargas* described an organization in which NF members on the street made regular contributions to the NF bank. As we have summarized above (in part II.A.5), there was evidence in this case that some regiments continued to operate that way, but not defendant's.

The Attorney General asserts that the jury in this case could have reasonably concluded: "the NF's goal was simply to have money put in the NF bank and on the books for members of the NF"; defendant's " methamphetamine and PCP conspiracies were in his private interest, each involving separate, if sometimes overlapping groups, and that while he paid dues to NF and was given street authority by Guillen, the conspiracies alleged were not solely conspiracies with members of the NF solely to fund the NF"; and defendant "did not have an agreement with the NF as such, but rather that any agreement he had was with Guillen, the NF general in Pelican Bay who controlled the street regiments." We do not understand the distinction attempted in this last point.

The Attorney General provides no record citations for these statements.[14] We do not believe the jury could have reasonably reached these conclusions based on the evidence. What the Attorney General asserts does not resemble the prosecution's arguments to the jury. The prosecutor did not argue that defendant was communicating with Guillen, paying dues, or putting money in a NF bank, and for good reason.[15]

We have summarized above (in part II.A.5) the evidence that members of other regiments were paying dues to incarcerated leaders of the NF, but there was no similar

---

[14] In another context, the Attorney General's brief cites the testimony of Sergeant Lewis and Mendoza about the obligation of members of other regiments to pay $200 monthly dues, but no testimony about members of defendant's regiment paying dues.

[15] We observe that it is not unusual in this kind of multi-week, multi-count gang case for the parties on appeal to lose track of the facts presented to the jury and the arguments made by their trial attorneys.

evidence that defendant had paid any NF dues or put any money on Guillen's books or in a NF bank. Debbie testified that when defendant met with other regiment leaders, Ramirez talked about messages he had received from Pelican Bay saying defendant had not been communicating with them and "hasn't paid his dues . . . ." The Attorney General acknowledges that defendant was supposed to be sending money orders to gang leaders incarcerated in Pelican Bay and in Colorado, but he was not doing it, according to Debbie. Clark testified that when he was defendant's second in command, he did not collect dues from regiment members. Defendant does not appear to have been playing by the NF rules or following its directives.

Other evidence that defendant had engaged in multiple drug sales conspiracies was that defendant had at least two different individuals as sources of methamphetamine and PCP, and he provided those drugs to different individuals. For example, while defendant regularly supplied Clayton Clark, his second in command, with methamphetamine to sell, defendant did not involve Clark in PCP distribution until after defendant was arrested. Meanwhile, Ramirez was obtaining PCP from defendant indirectly through a third party, Abundiz.

Defendant contends that Mendoza, Ramirez, and Clark all testified that the NF leadership controlled what crimes NF members on the streets could commit and what drugs they could sell. The record citations do not support this contention. Even if each gang member had uniformly testified that the gang controlled all his thoughts and actions and those of other NF members, the jury would not have been required to believe them. The scope of each conspiracy presented questions of fact and credibility for the jury to decide.

The Attorney General argues at great length that the assault conspiracies were separate from each other because defendant had different, personal reasons for assaulting Cervantes and not Levyas. Also, the drug sales and drug smuggling conspiracies in counts 2, 3, and particularly count 4, smuggling, were independent of each other.

37

We need not closely examine or itemize the distinct details of each conspiracy to determine whether a factual issue was presented regarding the number of conspiracies. The premise of defendant's assertion of one overarching conspiracy is that everything defendant did was for the advancement and under the direction of the NF gang. While there was no dispute that defendant was a NF member, there was evidence that defendant disobeyed the gang's directive to devote a portion of the proceeds of regiment drug sales to the gang. We cannot say as a matter of law that there was no evidence to support alternative findings about the number of conspiracies or their objectives. The court properly submitted to the jury the question whether any of the five alleged conspiracies was merely part of a larger conspiracy.

## B. *CRIMINALLY THREATENING DEBBIE GUZMAN*

The jury was instructed in terms of CALCRIM No. 1300 that proving a violation of section 422 as charged in Count 5 involved establishing six elements: "[1] The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Debbie Guzman; [2] [t]he Defendant made the threat in writing; [3] [t]he Defendant intended that his statement be understood as a threat and intended that it be communicated to Debbie Guzman; [4] [t]he threat was so clear, immediate, unconditional, and specific that it communicated to Debbie Guzman a serious intention and the immediate prospect that the threat would be carried out; [5] [t]he threat actually caused Debbie Guzman to be in sustained fear for her own safety, and; [6] Debbie Guzman's fear was reasonable under the circumstances." "Sustained fear means fear for a period to time that is more than momentary, fleeting, or transitory. [¶] There are different degrees of unconditionality. A threat which may appear conditional on its face can be unconditional under the circumstances. Conditional threats are true threats if their context reasonably conveys to the victim that they are intended. [¶] The word 'immediate' means that degree of seriousness and imminence which is understood by the

38

victim to be attached to the future prospect of the threat being carried out, should the conditions not be met. An immediate ability to carry out the threat is not required."

The jury was also instructed about the elements of attempted criminal threat, a lesser offense of criminal threat, in terms of CALCRIM No. 460.

**1.** *Sufficiency of the Evidence*

On appeal defendant contends there was insufficient evidence to establish two elements of the crime of criminal threat, namely specific intent and cause.

Familiar rules apply to appellate challenges to the sufficiency of the evidence to support a criminal conviction. " 'Claims challenging the sufficiency of the evidence to uphold a judgment are generally reviewed under the substantial evidence standard. Under that standard, " 'an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt.' " [Citations.] " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " [Citations.]' (*In re George T.* (2004) 33 Cal.4th 620, 630-631.) Furthermore, 'In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]' (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)" (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1347.)

39

**a.** *Defendant's Intent*

Defendant asserts there was a lack of proof that he intended his wife to take his letter as a threat. On appeal he asserts they had a contentious, roller-coaster relationship "sometimes resulting in threatening statements from both parties" and he points to their first phone conversation about the letter on August 16, 2007 to illustrate his intent. At trial defendant played a recording of the first call to the jury during his opening statement. At the close of evidence, defendant argued to the jury that the phone calls containing no threats by him, such as their initial laughter-filled discussion of his letter and his later phone conversations with Debbie in December 2007 about other topics such as the search of their residence, were more emblematic of his feelings and intent.

On appeal as at trial defendant downplays his telephone conversation with Debbie on August 18, 2007. In that conversation she again brought up whether he meant what he had written, even though they had laughed about it during a conversation two days earlier. While the second conversation was cryptic, probably due partly to their awareness it was being recorded, she posited that he "would not" do that to her. He answered, "Yeah, you" and asked if she was getting cold feet.

The prosecutor attached importance to this second post-letter conversation in argument to the jury. The prosecutor did acknowledge, "during those phone calls that you've heard, it's clear that the Defendant, they have a roller coaster relationship, and they go up and down." Also, Debbie was not terrified when she first received the letter, as evidenced by their first phone conversation. The prosecutor also argued that, despite the joviality of the first call, defendant was concerned about the amount of information Debbie had about him. That was "the genesis of that letter." It was a specific threat to have her killed. "It even says, 'you better ask somebody.' And she even gave him on that phone call, an out; an opportunity to say, [']no[, t]hat was just a joke[, t]hat was just

40

a joke['] because she specifically came back to it and asked him about it, and she said, 'you wouldn't really do that to me,' and he said, 'yeah, I would.' "

A person's intent must often be inferred from circumstantial evidence. (*People v. Falck* (1997) 52 Cal.App.4th 287, 299.)  As the prosecutor argued to the jury, that second phone conversation amounts to substantial evidence that defendant intended his wife to take his letter as a threat.

**b.** *The Cause of Debbie's Fear*

Regarding the true cause of Debbie's fear, on appeal defendant advances a factual argument he did not make to the jury.  He argues that Debbie's fear was caused not by his August 1997 letter, but by the NF's reputation for dealing harshly with snitches. Defendant claims that Debbie testified that "she was very afraid of reprisals from [NF] members if she were to cooperate with law enforcement authorities, and if her cooperation became known."[16]  Defendant's record citations do not support this statement.

Defendant asserts, "When she chose to cooperate, she of course feared the [NF]; but that fear was no greater because of her husband's letter than it would have been

---

[16]  We recognize that defendant made a similar argument in his motion for new trial, which asserted:  "It was not until December of 2007 after police contacted Debbie Guzman and raided her home that Debbie Guzman became fearful for her safety. Therefore, the evidence establishes that Debbie Guzman was placed in fear not by the August 2007 letter, but rather the actions of the police in making Debbie wear a wire and testify against gang members.  Debbie Guzman was well aware of the possible repercussions of wire tapping alleged drug dealing conversations and testifying against the [NF] organization.  It was these factors that caused Debbie Guzman to be in fear, and not the August 2007 letter which she testified that she did not take seriously at the time."

This was a theme defendant had sounded in his opening statement ("what she's really afraid of is going back to prison," "she wasn't afraid of him, and her real fear happened after the police essentially gave her no choice"), but he did not elaborate on this theme in closing argument, perhaps because it was unsupported by Debbie's testimony.

without the letter." This is mere argument on appeal. There was no such testimony. When Debbie was on the witness stand, she was not asked if her fear of NF reprisal would have been the same without defendant's letter.

The statute imposes two requirements on the proof of a threat victim's fear. First, there is a subjective component, that the threat actually caused sustained fear. Second, the actual sustained fear must be objectively reasonable, to the extent fear can be described as "reasonable." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1139-1140.) These are both factual questions for the jury to resolve. If substantial evidence supports the jury's implicit findings, an appellate court should "not substitute its evaluation of a witness's credibility for that of the fact-finder." (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1339 (*Mendoza*).)

At trial the prosecutor argued to the jury: "A threat which may appear to be conditional on its face is unconditional under its circumstances. Conditional threats are true threats if their context reasonably conveys to the victim that they are intended. [']If you leave me[,] I will kill you.['] 'Death will part us.' And, again, immediate— obviously, the Defendant does not have someone right there at the time the letter is read to carry out the threat, but that's not what the law requires. Immediate means the degree of seriousness and imminence which is understood by the victim to attach to the future prospect of the threat being carried out should the condition not be met." "The moment that she realized she was considering cooperating with law enforcement because of the pressure they were putting on her, her mind immediately went back to that letter. She thought back to that threat, and that threat made her think, [']my husband is going to have m[e] killed if I make this decision.['] So much so that she even told the officers, [']it's in the letter. You got to look.[']"

As the jury was instructed, case law has established that some conditional threats still qualify as "so" unconditional as to convey the serious intention of the utterer and a

42

future prospect of execution to the listener. (*People v. Bolin* (1998) 18 Cal.4th 297, 340.) The threat need not create an immediate fear.

Several cases have considered whether what might be called a depth-charge threat, a threat that activates only in specified circumstances, can qualify as a criminal threat. The prosecutor in our case acknowledged to the jury, "Obviously there was a delay because when she became real fearful from that threat from August 15th, until she began cooperating with law enforcement in December of 2007 . . . ."

The jury in *People v. Solis* (2001) 90 Cal.App.4th 1002 (*Solis*) asked the very questions at the heart of defendant's arguments during deliberations about a criminal threat charge. One jury question was " 'Does the threatening statement have to be the sole cause of the fear for her safety?' " Another two questions posed whether a statement not initially considered a threat may later be considered a threat under changed circumstances. (*Id.* at p. 1012.) "Over defense counsel's objection, the court told the jury that the threatening statement does not have to be the sole cause of the victim's fear for her safety and that a statement the victim does not initially consider a threat can later be considered a threat because of a subsequent action or event." (*Id.* at pp. 1012-1013.) The appellate court reasoned that the nature of a threat may be revealed by subsequent conduct by the defendant and other relevant circumstances. (*Id.* at p. 1014.) It concluded that the trial court "in response to the jury's questions, properly informed the jury that the threatening statement does not have to be the sole cause of the victim's fear and that a statement the victim does not initially consider a threat can later be seen that way based upon a subsequent action taken by a defendant . . . ." (*Ibid.*)

*Mendoza*, *supra*, 59 Cal.App.4th 1333 illustrates that actions by others can also make a threat real after it is uttered. The victim in that case testified that "she did not initially take appellant's words as a threat because appellant was always joking around. At trial she denied appellant's words alone frightened her." (*Id.* at p. 1338.) His words were that " '[h]e was going to talk to some guys from Happy Town,' " his criminal street

43

gang, because she had " 'fucked up his brother's testimony . . . .' " (*Id.* at p. 1337.) The appellate court acknowledged that these words by themselves "did not articulate a threat to commit a specific crime resulting in death or great bodily injury." (*Id.* at p. 1340.)

However, 20 to 30 minutes after this conversation, when a car horn honked and the victim looked out her front door, she saw defendant's friend parked across the street from her home. A few minutes later, her sister came home and told her defendant's friend was looking for her. The witness then feared for her life and called the police. (*Mendoza*, *supra*, 59 Cal.App.4th at p. 1338.) The appellate court found there was substantial evidence that the defendant's words had eventually placed the victim in a state of sustained fear, if not when he uttered them, at least when she heard a fellow gang member was looking for her and she saw him near her house. (*Id.* at p. 1342.)

On appeal defendant points to another potential source of Debbie's fear. While she was cooperating with the police, "it was Solis and Rodriguez, on behalf of Clayton Clark, who made threatening phone calls to her, expressing suspicion that she was cooperating with law enforcement . . . ." It is true that, after Rodriguez questioned Debbie during a January 18, 2008 phone conversation about why she had not mentioned the search of her house, she told Sergeant Lewis that she was afraid of being exposed as an informant. However, no one until now has described this call as threatening. When Debbie told Clark about the call on February 5, 2008, she said Rodriguez was drunk, "acting smart" and "rude." Even if Debbie had perceived Rodriguez's challenge to her as threatening, as the Attorney General asserts, it is likely that this challenge reinforced defendant's earlier statement that he would have her killed if she did him wrong, just as the conduct by fellow gang members in *Mendoza* clarified the threat made in that case.

Without citing *Solis*, the Attorney General argues, "Section 422 does not state that the fear from the threat must be the sole source of fear that a victim experiences after receiving the threat. Evidence that Mrs. Guzman might have experienced fears from another source does not mean that the threat did not cause sustained fear." We agree that

44

the elements of a violation of section 422 do not include a requirement that defendant's letter have been the sole cause of Debbie's sustained fear so long as it was a substantial factor in actually causing her fear. Her testimony that she thought back to the letter with fear once she was considering cooperating with law enforcement was substantial evidence supporting the causation element of the offense.

## 2. *Attempted Threat*

On appeal, defendant contends that the prosecutor proved at most an attempted criminal threat. "[E]ven if the evidence would support a finding that Mr. Guzman's letter was written with the requisite intent, and that it was the type of threat that reasonably could have caused Mrs. Guzman to be in sustained fear for her safety, the record does not support a conclusion that the threat actually caused her to be in such fear, because her fear was due to other causes, not the letter, and in other words, she would have had the same fear with or without the letter, for the reasons" already asserted.

This was not what defendant argued to the jury. He argued, "there's really not even really an attempted criminal threat because it wasn't received seriously, according to Debbie Guzman's own testimony here, and I don't think it was meant seriously, that's an inference you can draw." In defendant's new trial motion, however, he argued that the court should reduce his criminal threat conviction to an attempted threat because the element of sustained fear was lacking.

*People v. Toledo* (2001) 26 Cal.4th 221 identified three situations that would amount to an attempted, but not completed, criminal threat. Defendant asserts that the third one is most comparable to his case. "[I]f a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person

45

reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Id.* at p. 231.)

As we have rejected defendant's factual argument regarding the actual cause of Debbie's fear (in part III.B.1, *ante*), it follows that we have no basis for reducing his conviction to an attempted threat.

## 3. *Causation*

On appeal defendant contends that the phrase "actually caused" in CALCRIM No. 1300 has a technical meaning peculiar to the law that requires definition. Defendant does not elaborate on what that peculiar meaning is. We disagree. Actual cause is used in its ordinary sense in that instruction.

Defendant also contends that, in light of the factual controversy at trial about what caused Debbie's fear, the court should have given a sua sponte instruction in terms of CALCRIM No. 240 as follows: "There may be more than one cause of [fear]. An act causes [fear], only if it is a substantial factor in causing the [fear]. A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the [fear]." (Cf. CALCRIM No. 620 [when more than one cause of death].)

We accept the premise that when there is a factual dispute about whether a criminal defendant's conduct was among the causes of a victim's fear, injury, or death, the trial court sua sponte must give instructions about proximate causation and intervening, superseding causes. (*People v. Bernhardt* (1963) 222 Cal.App.2d 567, 590-591; cf. *People v. Bland* (2002) 28 Cal.4th 313, 334-335 ["proximate" cause must be defined for jury when used in instruction]; *People v. Fiu* (2008) 165 Cal.App.4th 360, 372 [jury was adequately instructed on concurrent, but not superseding, causes of death].)

However, that premise did not apply to this trial. Defendant did not argue to the jury that the fear his letter caused Debbie was superseded by an intervening cause. As we have explained above, defendant did not acknowledge to the jury that his letter caused

46

her *any* fear at all. Instead, what defense counsel argued was: "when she got up on that witness stand and was asked about that letter, and she said, [']well, to tell you the truth,['] or words to that effect, [']I really [didn't] take it seriously at the time.['] That created a moment of silence because my entire plan to impeach her was unnecessary. She got up on the stand and said, [']I didn't take it seriously. I never took it seriously.[']"

He continued, it was "not the law" that her fear upon cooperating with law enforcement related back to the letter. It was for the jury "to decide, when she got this letter, it was something that put her in sustained fear as opposed to something else that happened later . . . ." "She gets on the stand and says, [']you know, I was never afraid, but now all of [a] sudden I'm being asked to wear a wire and work for the police.[']" Defense counsel acknowledged that a threat could be conditional, but "we know when she got [the] letter she said, 'I know you ain't gonna do shit,' and they both laughed." There was no evidence of even an attempted criminal threat, "because it wasn't received seriously, according to Debbie Guzman's own testimony here . . . ."

As the Attorney General states, "the defense theory was that the interactions between appellant and his wife showed that the letter did not cause fear, not that it was only a remote cause of the fear." Had defense counsel asked for an instruction like CALCRIM No. 240 saying the letter had to be only a substantial factor in causing Debbie's fear, it would have weakened his absolute position and made it easier for the jury to convict defendant of the criminal threat charge. The defense developed no evidentiary basis requiring the court to instruct the jury to decide whether Debbie's fear had one or more causes superseding defendant's threatening letter.

In any event, we do not understand how defendant could have been prejudiced by the omission of such an instruction. Defendant's letter stated in part, "if my baby does me wrong, death going to part us." Her cooperation with law enforcement against defendant and members of his regiment would amount to doing him wrong. Debbie testified that she was not afraid when she received the letter in August 2007 because she

47

intended to stand by defendant, but she became afraid in December 2007 and January 2008 when conditions changed and she agreed to cooperate with law enforcement after they searched her residence and confronted her with evidence of her guilt. Debbie did not testify, contrary to defendant's appellate arguments, that she would have been as afraid of NF reprisals without his written threat.

Short of disbelieving Debbie's testimony about her fear, the jury could not have concluded that defendant's letter was not at least a substantial factor in causing her fear. Accordingly, we conclude it is not reasonably probable that the verdict would have been more favorable to defendant had the court given such a clarifying instruction. (*People v. Catlin* (2001) 26 Cal.4th 81, 156 ["the evidence was overwhelming that paraquat poisoning was at least a substantial factor in, if not the sole cause of, her death."]; *People v. Burnett* (2003) 110 Cal.App.4th 868, 879 ["No reasonable jury could have found that defendant's actions were not a substantial factor in causing Leo's death or that Leo's death was unforeseeable."].)

## C. *EVIDENCE OF CONSPIRACIES TO ASSAULT*

Defendant challenges the sufficiency of the evidence supporting his convictions of conspiring to assault Daniel Cervantes (count 6) and Henry Leyvas (count 7).

While these conspiracies allegedly occupied different time periods, namely January 22 to October 27, 2008, for Leyvas and May 1, 2008, to April 23, 2009 for Cervantes, the documentary evidence of both conspiracies was one kite written by Frank Ruiz on October 21, 2008 and sent to the Elmwood jail facility. The kite discussed several reported problems in the facility and asked for reports to be filed with 4-B, where Ruiz and defendant were housed in jail. It also stated, " 'Also concerning Bear Cervantes. He's been deemed no good. Thus his removal was just.' " " 'There's also a registered sex offender in M-8. I believe his name is Henry Leyva. He's to be dealt with ASAP.' "

48

## 1. *Jury Argument*

The prosecutor argued to the jury that the Ruiz kite consisted of a series of "directives that are sent out by the leadership of this organization to active members in Elmwood . . . ." At the time, "Frank Ruiz was the authority in charge, the second in command to the Defendant, Lorenzo Guzman." Defendant was "the overall authority in the county jail as the regimental commander . . . ." According to Sergeant Lewis, Officer Gillotte, John Mendoza, Sammy Ramirez, and Vince Tirri, "only the regimental commander has the authority to order removals in the county jail, and they must conduct an investigation before that order is given." The Northerners in Elmwood were required "to follow the directives to remove inmates once they were ordered, and once they were determined and told to remove this person, or that this person was deemed 'no good,' that it was incumbent upon them to remove them with a deadly weapon. And we know that the Defendant actually told Vince Tirri whey they were housed together in the Super Max that he told Vinni Tirri that the reason why he had Danny Cervantes removed and deemed him – well, not removed, but why he deemed him 'no good' was "because Danny Cervantes owed him a $400 drug debt . . . ." "[A]t the time that that message went out, we know that the only person that had the authority to be the authority behind that kite deeming Bear Cervantes 'no good' was the Defendant. And we know that everyone, you've heard from all of the experts, John Mendoza, Sammy Ramirez, even sex offenders, every one of those individuals that are going to be removed by the organization, there has to be an investigation done into it. They have to know exactly what it is. Because removing someone from the organization is something that you can't go back on, and whoever makes the decision is responsible for that decision. And so if you make a bad decision, if you remove someone for reasons that are unjust, that person could be subject to discipline by the organization themselves. And that authority only resides with the regimental commander, and that was the Defendant. He was the only

49

person that would have the ability to give the authority for Frank Ruiz to write it in that kite."

Defendant argued to the jury that sometimes removals were not ordered by the highest authority. The gang's rules were not always followed. "Frank Ruiz said, ['] well, I was running this as the overall authority.[']" "I don't even think a conspiracy has been proved[] [i]f you give Frank Ruiz any credence whatsoever[. N]ow, I understand he has motive to help[] the actual gang member. He has [a] motive . . . to help Mr. Guzman. He wouldn't be here if he wasn't helping him . . . ."

Defendant argued that the prosecution's evidence was inconsistent about whether prior approval or an investigation was required to assault a sex offender like Henry Leyvas.

Defense counsel asserted that Ruiz had testified "[']I got a kite about Henry Leyvas that said that he had raped somebody's sister. I'm the guy who's in charge on that, and I wrote the kite, and I did it. I didn't discuss it with Lorenzo Guzman.[']" Mendoza testified that people break gang rules all the time.

Defense counsel continued that everybody agreed Ruiz "was running the day-to-day functions of the jail." The kite said Cervantes' "removal was just" because Ruiz testified that he thought "this whole thing with Cervantes was past tense" because he had received misinformation that Cervantes had gone into protective custody. In fact, though Tirri said that he heard Cervantes was assaulted, Cervantes testified that he was never assaulted and that no one had tried to assault him.

"I don't think they have proven their case. They haven't proven their case as to Henry Leyvas for sure because the conspiracy requires an actual agreement. I don't think they have proven an agreement. I think it's at least—I don't think you can reject Frank Ruiz's testimony. He did it on his own." The prosecutor did not prove that defendant "entered into an agreement with anybody to assault either Henry Leyvas or Danny Cervantes."

50

## 2. *Appellate Argument*

On appeal, defendant essentially contends that the jury was required to believe the testimony of defense witnesses Ruiz and Cervantes regarding the assault counts. "[B]oth Ruiz and Cervantes testified at the trial, and in light of their testimony the prosecution's position was not tenable, because the information on which it was based was shown to be incorrect." Defendant's opening brief reviews their testimony in great detail.

In other words, defendant is asking this court to believe the testimony of Ruiz, apparently rejected by the jury, that when he wrote the kite in October 2008, defendant had been temporarily stripped of authority and placed "on freeze" by a mysterious kite that Ruiz destroyed after reading. According to defendant, "all the evidence is that he was 'on freeze' at the time [the kite] was issued." Ruiz's kite was intended to calm people in Elmwood down, on the false assumption that Cervantes had already been removed. Ruiz did not discuss the kite with defendant before writing it. Ruiz and Cervantes both testified that Cervantes talked to Ruiz in February 2009 about his $400 debt to defendant. Ruiz told him not to worry about it and just pay it off after his release.

We have reviewed the testimony of Cervantes and Ruiz above (in part II.D) and need not summarize it in detail here. It was for the jury to determine their credibility. It is not the role of an appellate court to redetermine questions of credibility. (*People v. Osslo* (1958) 50 Cal.2d 75, 84.) Suffice it to say that the jury had reason to disbelieve each one of them.

Apart from Ruiz's testimony that defendant was temporarily removed from his position as the overcall NF jail authority when Ruiz wrote the kite, the prosecution's evidence established that defendant was the only NF authority in the Santa Clara County Jail who could authorize removals and that he had a motive to deem Cervantes no good, namely an unpaid drug debt. Defendant was similarly the authority for Ruiz's kite identifying Leyvas as a target for removal, even if NF policy allowed the removal of a

51

sex offender without a regimental commander's prior written approval, as defendant suggests.  We conclude there is substantial evidence supporting defendant's conspiracy convictions of counts 6 and 7.  (Cf. *People v. Lopez* (2013) 56 Cal.4th 1028, 1071.)

## IV. DISPOSITION

The judgment is affirmed.

_____
RUSHING, P.J.

WE CONCUR:


_____
PREMO, J.



_____
MÁRQUEZ, J.




***People v. Guzman***
**H039532**

53